GOODWIN, Administrator, and others, Appellants, vs. VON
        COTZHAUSEN and others, Respondents.
    SAME, Respondents, vs. SAME, Appellants.

*March 13—May 4, 1920.*

*Corporations: Dissolution at suit of minority stockholder: Evi-
    dence: Loss of profits: Liability of corporate officers for mis-
    management: Finding of referee: Review by court: Parties
    entitled to costs and attorney fees.*

1. Where a corporation has been plundered by its officers or so
    mismanaged as to bring it to the verge of bankruptcy,
    threatening minority stockholders with the loss of their in-
    vestment, and it seems certain that the purposes for which
    the corporation was organized are no longer attainable, and
    there is no other adequate remedy, a court of equity, in the
    exercise of its inherent power, will appoint a receiver, wind
    up the affairs of the corporation, distribute its assets, and
    decree a dissolution at the suit of a minority stockholder.

2. In an action for the appointment of a receiver for a lithograph-
    ing company brought by minority stockholders on the ground
    of mismanagement by its president and general manager, the
    evidence is *held* to support a finding that the corporation
    could no longer be operated under the domination of such
    president except to its own ruin and the loss to the stock-
    holders of their entire investment, and that a sale of the
    assets and the winding up of its affairs should be had.

3. Where a referee recommended the allowance of a certain
    amount of general damages based upon past profits of the
    business as an established one, it was error for the court to
    reduce the amount so recommended, where there was ample
    evidence to sustain the referee's finding and no clear pre-
    ponderance against it.

4. A corporate officer may be held liable for profits lost by his
    mismanagement, and past profits of an established business
    constitute a legitimate basis on which to estimate future
    profits of the same business, properly managed, which were
    not realized because of defendant's mismanagement.

5. Where in a minority stockholder's suit for a receivership and
    dissolution of a corporation other minority stockholders are
    joined as plaintiffs by order of the court, and such other
    plaintiffs have rendered valuable services in conserving and
    saving the fund for the benefit of all the stockholders, they
    are as much entitled to compensation out of the fund re-
    served for attorneys' services and expenses as the original
    plaintiff.

APPEALS from an interlocutory decree of the circuit court for Milwaukee county: MARTIN L. LUECK, Judge. *Modified and affirmed.*

This action was commenced in June, 1915, by the plaintiff *H. W. Goodwin,* as administrator of the estate of J. Arthur Davis, deceased, and *F. B. Thomas,* minority stockholders of the *Milwaukee Lithographing Company,* against the *Milwaukee Lithographing Company* and *Alfred von Cotzhausen,* its president, general manager, and treasurer, and other officers, for the appointment of a temporary and permanent receiver for said corporation to take charge of all its property and assets and to administer the same pending the determination of this suit, and for the restitution of funds alleged to have been unlawfully abstracted therefrom by the said *von Cotzhausen* and other officers and directors of the corporation. The suit was brought by plaintiffs on their own behalf and on behalf of all other stockholders similarly situated. Thereafter petitions were made by *Edgar A. Goetz* and Lillie A. Brosius, also minority stockholders, and they were made parties plaintiff, and they served separate supplemental complaints and a joint second supplemental complaint, demanding a winding up of all the business, property, and affairs of the *Milwaukee Lithographing Company,* a conversion thereof into cash, to be applied to the payment of debts and then distributed among the stockholders.

Upon motion made October 9, 1915, a receiver was appointed March 9, 1916, who took charge of the property, business, and affairs of the said *Milwaukee Lithographing Company* and continued to administer the same until the entry of the judgment herein.

On June 29, 1916, the case was referred to the Hon. Max W. Nohl, court commissioner, to hear, try, and determine. In due course he made and filed his findings of fact and conclusions of law, in which he found that the *Milwaukee Lithographing Company* was organized June 7, 1902, with an authorized capital stock of $100,000, divided

Goodwin v. von Cotzhausen, 171 Wis. 351.

into 1,000 shares of $100 each; that by amendment of its articles of incorporation on the 28th day of April, 1910, its capital stock was increased to $250,000, divided into 2,500 shares of $100 each, and that at the time of the commencement of this action there were issued 1,867 shares of said stock, of which 677 shares were owned by *von Cotzhausen* and 600 shares by the *American Fine Art Company,* a corporation controlled and dominated by the said *von Cotz- hausen;* that from its organization to the 29th day of August, 1913, J. Arthur Davis was its president and general manager; that from August 29, 1913, to March 9, 1916, *von Cotzhausen* was the president and general manager thereof; and that from September 30, 1910, to March 9, 1916, the said *von Cotzhausen* was treasurer thereof.

That the *Milwaukee Lithographing Company,* from the time of its organization up to the time that *Alfred von Cotzhausen* became active in the control of it, in the year 1913, was a prosperous concern; that the gross sales made, net profits made, losses sustained, dividends paid, and the surplus at the end of each fiscal year of said corporation, from the time of its organization down to March 9, 1916 (the time at which the receivers were appointed in this case), according to the company's books, were as follows:

| Year. | Sales. | Profits. | Losses. | Dividends. |
|---|---|---|---|---|
| 1903 | $138,583 50 | $12,361 24 | Loss | $3,354 28 |
| 1904 | 143,036 27 | 8,054 90 | | 5,011 12 |
| 1905 | 169,317 88 | 9,531 23 | | 6,467 99 |
| 1906 | | 22,913 49 | | 3,595 62 |
| 1907 | 215,864 33 | 30,785 12 | | 16,232 50 |
| 1908 | 192,101 79 | 13,649 92 | | 30,200 00 |
| 1909 | 255,993 53 | 32,766 17 | | 21,690 00 |
| 1910 | 250,823 00 | 27,532 63 | | 1,010 00 |
| 1911 | 297,692 08 | 39,794 62 | Cash | 25,215 67 |
| | | | Stock | 50,666 00 |
| 1912 | 310,697 23 | 45,465 50 | | 22,404 00 |
| 1913 | 289,192 93 | 11,617 64 | | |
| 1914 | 164,508 45 | | $21,260 85 | |
| 1915 | | | | |
| To July 12 | 25,783 27 | | 21,212 36 | |
| To Nov. 12 | 15,086 94 | | 8,379 72 | |
| To March 9 | | | 22,772 92 | |

That by various schemes and devices the said *Alfred von Cotzhausen,* from the year 1911 down to the appointment of the receiver herein, fraudulently, corruptly, and unlawfully diverted various sums of money from the said *Milwaukee Lithographing Company* and appropriated the same to his own use, which, with interest thereon up to the time of the entry of judgment herein, approximated $60,000; that from on or about the 1st day of January, 1911, the said *Alfred von Cotzhausen* did not faithfully or properly perform his duties as an officer, director, and employee of the said *Milwaukee Lithographing Company* or as manager thereof; that he, on the contrary, carelessly, negligently, and recklessly failed to properly manage the business and affairs of the said *Milwaukee Lithographing Company* and failed to perform his duties as an officer, director, and manager from such date down to the appointment of the receivers herein on March 9, 1916; that he was inattentive to his duties and mismanaged the said corporation's business, property, and affairs; that by reason and in consequence of such carelessness, negligence, recklessness, failure, mismanagement, and inattention to the proper performance of his duties as an officer, director, manager, and employee of the said *Milwaukee Lithographing Company,* the said company was caused financial losses in the sum of $60,000, which losses the referee finds that the *Milwaukee Lithographing Company* sustained by reason of such careless, negligent, and reckless conduct and management, in addition to the specific abstractions before referred to; that the business of said company at the time the said *von Cotzhausen* became actively connected with it was a well-regulated, steady, and constant business, not subject to other than ordinary fluctuations, which ordinary fluctuations could, with ordinarily careful management, be overcome to such an extent as to prevent the diminution of the average yearly profits; that from the time said *Alfred von Cotzhausen* became so

actively connected with said company he could and should have conducted the business thereof in substantially the same manner in which it had been conducted theretofore and with like good results.

That at the time of the commencement of this suit and ever since, the said *Milwaukee Lithographing Company* was and now is in grave and imminent danger of ruin and insolvency; that the defendant *Alfred von Cotzhausen* for many years last past had and still has the reputation among the trade and business in which the *Milwaukee Lithographing Company* is engaged, as being unreasonable, unreliable, dishonest, and litigious, and as being a dangerous man to deal with; that he is an unfit, an improper, and incompetent person to have the management or control or to be an officer, director, agent, or employee of the said *Milwaukee Lithographing Company* or any of its business or to be actively interested in or identified with it; that by reason of his said bad reputation, his personal character, his general unfitness, and his known ownership of the majority of the stock of the *Milwaukee Lithographing Company,* the said company cannot safely or profitably continue in its said business; and that by reason of the things found by the referee and of differences existing between the stockholders of the said *Milwaukee Lithographing Company* continuance in business by the said company is impracticable and would be ruinous; that continuance in business would result in the stockholders thereof quickly losing the assets of the said corporation; that the wasting of the assets of the said corporation would soon result in insolvency; that there is no prospect of said corporation succeeding as a going concern; that *Alfred von Cotzhausen's* future active connection with said corporation would result in its being completely ruined; that the best interests of all stockholders, creditors, and persons interested in the said corporation require that all the assets, property, and effects thereof as they now exist or as

they may hereafter exist, including its good will,. be sold and that the affairs of the corporation should be wound up at the earliest possible moment; that there is no other adequate remedy to protect the stockholders; that the accomplishment of the object for which the company was organized is no longer possible, and that it would be to the best interest of all parties concerned that there should be sold to the highest bidder all of the assets, property, effects, and good will of the *Milwaukee Lithographing Company.* The referee also found that none of the other officers or directors of the *Milwaukee Lithographing Company* were guilty of any malfeasance, misfeasance, or nonfeasance and were not liable in the action.

As conclusions of law the referee found that the *Milwaukee Lithographing Company* should have judgment against the said *Alfred von Cotzhausen* for the various sums unlawfully abstracted from the company and appropriated to his own use, aggregating upwards of $60,000, and for the additional sum of $60,000 for the loss of profits and damage to the business as a result of mismanagement of the affairs of the corporation, and that a sale of all the assets, property, effects, and good will of the *Milwaukee Lithographing Company* be decreed, such sale to be conducted in the manner set forth in the findings.

The circuit court modified the report of the referee by substituting $30,000 for $60,000, the amount of damages found by the referee to have been sustained by the company because of loss of profits and business resulting from the mismanagement thereof by the said defendant *Alfred von Cotzhausen,* and entered judgment in the nature of an interlocutory decree confirming the report in all other material particulars, by which judgment was rendered against *Alfred von Cotzhausen* and in favor of the *Milwaukee Lithographing Company* for the various sums found to have been unlawfully abstracted and appropriated to his own use, aggregating approximately $60,000, and for the further sum of

$30,000 as damages resulting from loss of profits and busi-
ness due to the mismanagement thereof by the said *Alfred
von Cotzhausen.*

From the judgment so entered the defendant *Thomas*
appealed from certain portions thereof, but the appeal was
dismissed upon the argument of the case and requires no
further consideration.

The defendants *Alfred von Cotzhausen* and *Friedericke
Bode* appealed from the whole and every part of the judg-
ment.

The plaintiff *H. W. Goodwin,* as administrator with the
will annexed of the estate of J. Arthur Davis, deceased, ap-
pealed from the part of the interlocutory decree directing
the recovery from the defendant *Alfred von Cotzhausen* of
the sum of $30,000 instead of $60,000, and from so much
of the said interlocutory decree as adjudges and determines
that the plaintiffs *Brosius* and *Goetz* should have their just
and reasonable compensation for their attorneys' services
and other expenses incurred in this action and for the sub-
sequent costs and disbursements as adjudged in paragraph
18 of the interlocutory decree.

For the plaintiff *Goodwin* there was a brief by *Arthur J.
Pellette* and *Glicksman, Gold & Corrigan,* all of Milwaukee,
and oral argument by *Mr. Nathan Glicksman* and *Mr.
Pellette.*

For the plaintiffs *Goetz* and *Brosius* there was a brief by
*Austin, Fehr, Mueller & Gehrz* and *Arthur Breslauer,* all
of Milwaukee, and oral argument by *Mr. Breslauer.*

*Alfred von Cotzhausen* of Milwaukee, *in pro. per.*

*Arthur von Cotzhausen* of Milwaukee, for the defendant
*Bode.*

For the defendants *Clara Mueller, Laura Cotzhausen,* and
*Louis Cotzhausen* there was a brief by *Schmitz, Wild &
Gross* of Milwaukee, and oral argument by *Robert Wild.*

For the defendant *Marshall & Ilsley Bank* the cause was
argued orally by *C. W. Reeder* of Milwaukee.

OWEN, J.  We have for consideration questions raised by the appeals of *Alfred von Cotzhausen, Friedericke Bode,* and *H. W. Goodwin.*  Separate briefs were filed by *Alfred von Cotzhausen* and *Friedericke Bode.*  Neither brief contains any assignment of error, nor is any finding of fact challenged in either brief.  While it is to be gathered from the brief of the appellant *Alfred von Cotzhausen* that he is dissatisfied with the findings and with the judgment in general, there is no efficient challenge of any particular finding, nor is there any reference in the brief to any evidence in the record, or in the printed case prepared upon the appeal of *H. W. Goodwin* (which is the only case prepared by any of the appellants), to impeach the findings made by the referee and confirmed by the court.  The record in the case is exceedingly voluminous, consisting of over 6,000 pages of typewritten matter and six large boxes of exhibits, and a general examination thereof for the purpose of verifying the findings of the referee cannot be undertaken.  Under the circumstances, therefore, the findings of fact must be regarded as conclusive upon the appellants *Alfred von Cotzhausen* and *Friedericke Bode.*

We may, however, consider the question of whether the judgment or interlocutory decree from which the appeal is taken is warranted by the findings.  The appellants *Bode* and *von Cotzhausen* assail that part of the interlocutory decree which provides for a sale of the assets of the corporation, a distribution of the proceeds among the creditors and stockholders, and a winding up of its affairs.  This is the vital question in the case as it is submitted.

It is contended that a court of equity has no power or jurisdiction, at the suit of a minority stockholder, in the absence of statutory authority, to appoint a receiver for a corporation and wind up its affairs.  That such was the well-nigh universal rule until a comparatively recent date cannot be doubted.  This rule had its origin at a time when corporations were created by special charters the grants of

which conferred valuable and exclusive franchises upon
their grantees, and it was considered that, as the franchises
were granted by the state, they could be vacated or forfeited
only in a proceeding by the state; that their lives depend
upon the action of the state or the stockholders as a whole.
The reason for this rule has entirely ceased in respect to the
ordinary business corporation formed under general laws,
the privileges conferred upon which are open to all who
comply with statutory conditions, which conditions are
simple and formal in character and may readily be complied
with by any who desire to associate themselves for the pros-
ecution of any business venture. The ordinary business
corporations are not organized for the purpose of perform-
ing any public function and the state has no particular in-
terest in them. It is only those who invest their money in
them as stockholders or bondholders, and creditors thereof,
who have a substantial interest in their proper management
and business success. True, statutory regulations exist,
but such regulations are enacted for the benefit and pro-
tection of those financially interested in the corporation
and not for the protection of the state. The passing inter-
est of the state in their continuance is well illustrated by the
fact that a dissolution of the corporation automatically fol-
lows upon its failure to file certain reports in the office of the
secretary of state. Sec. 1774a, Stats. If the corporation
were an institution in which the state had a special interest,
its life would not be so summarily snuffed out for its mere
failure to report the names and addresses of its officers to a
public official.

The trend of modern decisions is in recognition of this
growing distinction between the present and the original
corporation, and there is now a respectable array of judi-
cial authority to the proposition that where a corporation
has been plundered by its officers, or they have so misman-
aged its affairs as to bring it to the verge of bankruptcy,
threatening the minority stockholders with loss of their in-

vestment, and it seems certain that the purposes for which the corporation was organized are no longer attainable, and there is no other adequate remedy, a court of equity, in the exercise of its inherent power, will appoint a receiver for the corporation, wind up its affairs, distribute its assets, and decree a dissolution thereof at the suit of a minority stockholder. *Miner v. Belle Isle Ice Co.* 93 Mich. 97, 53 N. W. 218; *Red Bud R. Co. v. South,* 96 Ark. 281, 131 S. W. 340; *Gibbs v. Morgan,* 9 Idaho, 100, 72 Pac. 733; *Riley v. Callahan M. Co.* 28 Idaho, 525, 155 Pac. 665; *Thwing v. McDonald,* 134 Minn. 148, 158 N. W. 820; *Phinizy v. Anniston City L. Co.* 195 Ala. 656, 71 South. 469; *Brent v. B. E. Brister S. Co.* 103 Miss. 876, 60 South. 1018; *Exchange Bank v. Bailey,* 29 Okla. 246, 116 Pac. 812; *Metropolitan F. Ins. Co. v. Middendorf,* 171 Ky. 771, 188 S. W. 790. In the above cited cases the principle was either applied or recognized that where the officers and directors, or majority stockholders, exercising exclusive management and control over a corporation, have abused their power and proved recreant to their trust by fraudulently conducting the affairs of the company so as to appropriate to themselves the profits and property thereof, to the detriment of the minority stockholders, and the corporation is on the verge of bankruptcy, and the attainment of the purposes for which it was organized is no longer possible, and there is no other adequate remedy for the protection of the minority stockholders, a court of equity may, at the suit of a minority stockholder, appoint a receiver for the property of the corporation, decree a winding up of its affairs and a dissolution of the corporation itself.

The fading analogy between the present business corporation and the corporation as originally conceived, was recognized by this court in *Katz v. De Wolf,* 151 Wis. 337, 138 N. W. 1013, where it was said:

"The development of corporation law began with a strictness of analogy between municipal and stock corporations

which is no longer fully observed. The change from the ancient mode of creating corporations by special act to permit organizations by public declaration or contractual undertakings acknowledged and filed in a public office, and the great multiplication of corporations thereunder, caused some further change. There is unquestionably a broad power of equity applicable wherever wrong is shown of such a nature as to arouse the equitable jurisdiction."

While that case did not present a situation calling for the exercise of the power, the language quoted forecast the opinion of this court with reference to its existence as well as its disposition to the exercise thereof. We agree with the Idaho court that

"The early doctrine that the affairs of a corporation could not be inquired into except by permission of the attorney general, and that courts of equity should not interfere with the power and authority of the directors of a corporation because that would result in its dissolution, has been modified to meet existing conditions. A large part of the business of the world is done through corporations, and . . . courts of equity should adapt their practice as far as possible to the existing state of society, and apply their jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise, and should not, from too strict an adherence to the forms and rules established under very different circumstances, decline to administer justice and to enforce rights for which there is no other remedy." *Gibbs v. Morgan, supra.*

The power, however, is one to be exercised with great caution. It is inherent in the nature of corporations that the affairs thereof are to be managed and directed as willed by the majority of the stockholders. Their decisions within the scope of legitimate discretion cannot be interfered with, and even though, in the opinion of the minority, the policies adopted by the majority are not for the best interests of the corporation, nevertheless they must accept such decisions and acquiesce therein. They cannot complain thereof unless they be prompted by fraud and bad faith, resulting in

the spoliation of the minority stockholders and ruin to the corporation.

With this understanding of the power of the court in the premises, let us consider the record in this case with a view of determining whether the circumstances here disclosed present a proper situation for the exercise of this power.

The tabulation set forth in the statement of facts showing the course of business of the company from the year 1913 down to the appointment of the receiver March 9, 1916, shows that up to the year 1913, the year during which the defendant *von Cotzhausen* acceded to the presidency and general management thereof, the company did a thriving business, earned handsome profits, and paid gratifying dividends. In the year 1912 the company made profits of $45,465.50. In 1913 they dwindled to $11,617.64. In 1914 there were losses of $21,260.85. The losses during 1915, up to November 12th, were $29,592.08, and from November 12, 1915, to March 9, 1916, there were further losses of $22,772.92. The amount of sales in 1912 was $310,697.23. In 1914, the first full year of management by *von Cotzhausen,* the sales were $164,508.45, a dropping off of nearly fifty per cent. The first six months of 1915 the sales were only $25,783.27, and from July 12th to November 12th of the same year the amount of sales was $15,086.94. This shows an amazing decrease in the business and indicates that in but a short time the business would be practically nil. One marvels at the possibility of such a slump in such a short time, but the record furnishes ample evidence for the reason thereof.

When *von Cotzhausen* assumed management of the company there was a well organized sales force. There was a general sales agent on the Pacific coast, one in New York, one in New Orleans, and two in Chicago. These sales agents were procuring the business for the company. Good business judgment would plainly require a continuance of

cordial relations between these sales agents and the company and a retention of their services. The evidence discloses, however, that *von Cotzhausen* immediately proceeded to get into a row with all these men and made it so disagreeable for them that they quit the service of the company. The services of one Frank W. Wentworth of Chicago appear to have been particularly valuable to the company. With reference to him the referee finds:

"That Frank W. Wentworth became connected with the *Milwaukee Lithographing Company* in 1902, soon after the organization of said company, first as agent, and later as the agent, representative, and manager at Chicago of said company, and as such controlled the so-called Wrigley business; that he continued as such agent, representative, and manager until April 17, 1914, when said Wentworth severed his connection with said company; that during the year 1910 the said company shipped goods, the orders for which were obtained by Wentworth, in the amount of $103,171.30; in 1911, $186,121.35; in 1912, $151,470.81; in 1913, $132,531.63; or a total of $573,295.09; that the total business of said company during said four years aggregated $1,355,595.99; that after said April 17, 1914, the whole of said Wrigley business was withdrawn by said Wentworth from and lost to the said company; that as a result of such withdrawal and loss the successful operation of said company as a profitable business enterprise was greatly impaired."

Instead of maintaining satisfactory arrangements with the said Frank W. Wentworth, *von Cotzhausen* started an action against him to recover for the company $36,000 which he claimed Wentworth owed to it for overcharges, which the referee finds to have been unfounded, resulting in the loss of Wentworth's services and the business which he secured for the company.

This furnishes but a glimpse of the real character, attitude, and diplomacy of the said *von Cotzhausen* and is but a small part of the evidence which justifies the finding of the referee "that the defendant *Alfred von Cotzhausen* for

many years last past had and still has the reputation among the trade and business in which the *Milwaukee Lithographing Company* is engaged, as being unreasonable, unreliable, dishonest, and litigious, and as being a dangerous man to deal with."

There are unpaid judgments against the company amounting to $12,557.11, together with accrued interest, and it owes the *Marshall & Ilsley Bank* $17,500. While this would not be a forbidding indebtedness for a going concern of the size of the *Milwaukee Lithographing Company,* it is nevertheless a serious matter in view of the fact that the company was running at a loss for more than two years preceding the appointment of the receiver.

We cannot escape the conclusion that this company can be no longer operated under *von Cotzhausen's* domination and control except to its own ruin and the loss by the stockholders of their entire investment. The purposes for which the company was organized are no longer possible of accomplishment, and the only rational thing to do is to wind up its affairs and save the stockholders from further loss; from which it results that that feature of the interlocutory decree providing for a sale of the assets of the company and a winding up of its affairs should not be disturbed.

The appellant *Goodwin* complains because the court reduced the amount of general damages, found by the referee to have been $60,000, to $30,000. In *Huebner v. Huebner,* 163 Wis. 166, 157 N. W. 765, it was said:

"The rule is well established in this court that past profits of an established business constitute a legitimate basis upon which to estimate the future profits of the same business conducted in the same manner, and that in a proper case such future profits may be recovered when the plaintiff has been prevented from making them by the wrongful conduct of the defendant."

We know of no reason why that principle is not applicable to the instant case. It is settled by the decisions of this

court that where there is ample evidence to support a referee's findings of fact and no clear preponderance against them, the trial court is not justified in setting them aside. *Erickson v. McGeehan C. Co.* 107 Wis. 49, 82 N. W. 694; *Ott v. Boring,* 139 Wis. 403, 121 N. W. 126; *Wojahn v. Nat. Union Bank,* 144 Wis. 646, 129 N. W. 1068. The evidence to which our attention has been called clearly sustains the amount of damages as found by the referee. If there is any evidence whatever against this finding it has not been pointed out to us, and our conclusion is that the trial court was not warranted in reducing the damages in this respect from $60,000, as found by the referee, to $30,000. The interlocutory decree should therefore be modified by substituting $60,000, the amount found by the referee for general damages, for $30,000, the amount thereof as fixed and determined by the trial court.

By the interlocutory decree it is adjudged that the plaintiffs *Brosius* and *Goetz* are entitled to just and reasonable compensation for their attorneys' services and other expenses paid or incurred in this action and that the amount thereof should be determined by the court or referee after the sale of the property and effects of the company has been made and the affairs of the company liquidated before the final decree shall have been entered herein, to be paid out of the corporate assets of the *Milwaukee Lithographing Company.* Of this provision the plaintiff and appellant *Goodwin* complains, his position being, as we understand it, that, as he originally commenced the action, he is the only party who should be compensated out of the fund conserved for attorneys' services and other expenses. The plaintiffs *Brosius* and *Goetz* were made parties plaintiff by order of the court. Up until such time plaintiff *Goodwin* no doubt had control of the action, but after that time he had no more control thereof than plaintiffs *Brosius* and *Goetz.* Cook, Corp. (7th ed.) 2738–2740. If the plaintiffs *Brosius* and *Goetz* rendered valuable services in the matter of conserving and saving the fund for the benefit of all the stockholders

of the corporation, no reason is perceived why they should not be compensated as well as *Goodwin*.   In this connection it should be observed that the amount of their reimbursement or compensation has not been fixed.   That is left by the interlocutory decree to be determined by the court or referee after the sale of the property and effects of the company, and at the present time neither the plaintiff *Goodwin* nor any other party interested has anything of which to complain.   However, in view of the fact that the question is presented, we think it proper to say that if the court shall determine that the plaintiffs *Brosius* and *Goetz* did render valuable services in the prosecution of the action and that their efforts contributed to the conservation of the fund, it is within the power of the court to provide for their reimbursement in such behalf.   No further questions call for consideration.

*By the Court.*—The interlocutory decree is modified by substituting sixty thousand ($60,000), dollars, for general damages as found by the referee, in lieu of thirty thousand ($30,000) dollars as determined by the trial court, and as so modified is affirmed.

WINSLOW, C. J., and KERWIN and ESCHWEILER, JJ., took no part.