CITIZENS STATE BANK OF SHEBOYGAN, Plaintiff and Respondent, vs. CITY OF SHEBOYGAN and others, Defendants and Respondents: SOUTHERN SURETY COMPANY, Defendant and Appellant.

GABRIELSE and others, Plaintiffs and Respondents, vs. CITY OF SHEBOYGAN and others, Defendants and Respondents: SOUTHERN SURETY COMPANY, Defendant and Appellant. [Three cases.]

*December 3, 1928—April 2, 1929.*

418

422

424

*Joseph E. Tierney* of Milwaukee, for the appellant Southern Surety Company.

*A. Matt Woerner,* city attorney, for the respondent city of Sheboygan.

*Charles Voigt* of Sheboygan, for the respondents Van Doeselaar, Gabrielse, and Calvert, doing business as the Sheboygan Excavating Company.

For the respondent Citizens State Bank there was a brief by *Bowler & Bowler,* attorneys, and *Buchen & Schlichting* of counsel, all of Sheboygan, and oral argument by *G. W. Buchen.*

The following opinion was filed April 2, 1929:

Doerfler, J.    The city of Sheboygan now holds the sum of $10,628.51, proceeds of certain bonds issued in place of

sewer certificates; and inasmuch as both the bank and the surety company claim this fund, the amount has been tendered and paid into court by the city, to abide the order and judgment of the court.

Prior to the execution of the surety bonds and the contracts, H. O. Schaefer & Sons filed two applications for bonds with the surety company, which said applications contained, among other things, the following provision:

"That in the event of the failure of the undersigned to comply with or make due performance of any covenant hereof or of the contract which the company is hereby requested to guarantee, . . . and for the better protection of said company [meaning the surety company], and as collateral security hereto and for all claims of said surety against the undersigned, that the undersigned do by these presents as of the date hereof, . . . convey and assign unto said company any and all payments, funds, moneys, or property due or to become due to the undersigned as provided in said contract. . . ."

The surety company's claim to the amount tendered and paid into court is based upon the provisions of the applications above set forth.

The contracts between the city and the contractor and the surety company contain the following provisions:

"And it is further agreed that, in case the contractor shall proceed properly and with due diligence to perform and complete this contract on his part, the board may, in their discretion, from time to time as the work progresses, grant to him an estimate of the amount already earned (reserving twenty per cent. thereon), which shall entitle the holder thereof to receive the amount due thereon, when the amount applicable to the payment of such work shall have been collected, and the condition, if any, annexed to such estimate shall have been complied with.

"And the city in consideration of the covenants of the contractor and sureties, herein contained, hereby covenants and agrees that upon the completion of said work by the contractor, pursuant to the terms of this contract and according to the plans and specifications of said work on file in the of-

fice of the board, and the true intent and meaning of this contract, the city will pay to the contractor any balance then remaining due and payable by the terms of this contract for said work, when the amount applicable to the payment of said work shall have been collected.

"And the said sureties, in consideration of the letting of this contract to the contractor, hereby guarantee and covenant and agree to and with the city that the contractor shall and will well and truly execute and.perform this contract on his part, under the superintendence and to the satisfaction of said board, and that they, the sureties, will well and truly pay on demand to the city any and all damage and damages, and sums of money, which the contractor shall be liable to pay to the city under this contract or any clause or agreement therein.

"And the contractor and sureties, in consideration of the premises, further covenant and agree that they will well and truly save and indemnify and keep harmless the city against all liabilities, judgments, costs, and expenses which may in anywise come against said city in consequence of the granting of this contract to the contractor, or which may in anywise result from the carelessness or neglect of the contractor, or his agents, employees, or workmen in any respect whatever; and that in case the contractor shall fail to fully and completely perform his contract within the time herein limited for the performance thereof, he and they shall and will pay to the city as liquidated damages for such default the sum of —— dollars per day for each day's delay in completing said work."

The bank bases its claim to the amount tendered and paid into court by the city upon the provisions above set forth, contained in the contracts, and also upon the respective assignments and orders for sewer certificates, and the delivery of the same by the city to the bank as collateral security for loans made by the contractor from the bank, and also upon the purchase of such certificates by the bank on the 22d day of December, 1925.

It is conceded that the Van Doeselaar Company, the assignee of the contracts from H. O. Schaefer & Sons, and the

city and the bank, had no knowledge whatsoever of the contents of the applications above referred to, and that the only parties having such knowledge are Schaefer & Sons and the surety company; that neither the applications nor certified copies thereof have ever been filed with any of the officers of the city. It is also conceded that the surety company, up to about the 1st day of July, 1926, had no knowledge whatever of the assignment of the two contracts which it secured, from Schaefer & Sons to the Van Doeselaar Company, or of the execution of such contracts for the Van Doeselaar Company by the Sheboygan Excavating Company.

The referee and the trial court held that the bank was entitled to the amount held by the city in the sum of $10,628.51, and that the rights of the bank are superior to those of the surety company. The question thus raised constitutes the principal issue between the bank and the surety company.

Under the provisions of the contracts above set forth, to which the surety company was a party, it is left within the discretion of the board of public works of the city of Sheboygan, as the work on the sewer contracts progresses, in case the contractor shall proceed properly and with due diligence to perform and complete the contracts, to issue to him from time to time estimates of the amount performed, which shall entitle the holder thereof to receive the amount due thereon, when the amount applicable to the payment of such work shall have been collected, and the condition, if any, annexed to such estimate shall have been complied with. The contracts also provide that out of the amount of such estimate twenty per cent. thereof shall be reserved, and it becomes important in this connection to determine the purpose for which such reservations are made. The contracts do not provide for a reservation for the benefit of materialmen or laborers, nor is a reservation made or required for the benefit of the surety. On the contrary, however, it becomes clear that the amount of such reservation is designed

to constitute a fund, the payment of which to the contractor depends solely upon the full performance of his contract; for it is provided in the second paragraph of the contracts that the city will pay the contractor, on the full performance of the work in accordance with the plans and specifications, any *balance* then remaining due and payable by the terms of the contract. But the claim is made by the surety company that the city expressly violated the terms of the contract by failing to reserve twenty per cent. of the estimates granted by the board, and that such failure was detrimental to the rights of the surety.

This argument would be persuasive had the contracts provided for such reservation for the benefit of the surety or for the benefit of laborers and materialmen. It appearing clearly that such reservations were for the benefit of the city alone, it was within the power of the city to waive the same and to pay the estimates in full if it so desired. At any rate the surety is not entitled to protection where the contracts fail to grant the same either by express language or by language used from which protection must necessarily be inferred. Furthermore, under the applications, the equitable assignment of the moneys, etc., to the surety company becomes effective as of the 27th day of June, 1925, in the event that the contractor fails to comply with the terms of his contract. At the time when the sewer certificates were purchased outright by the bank there had been no failure on the part of the contractor to perform; on the contrary, the contracts which the surety company had secured at that time had been substantially completed. So that if the provisions of the applications are properly construed in connection with the contracts themselves, to which the surety was a party, the equitable lien of the surety company could only extend to such moneys and property in the possession of the city with which it had not parted.

Whether a surety having an equitable lien has a superior

right to the proceeds as against a bank which has advanced money to finance a contractor who has assigned and delivered collateral security to secure the loan from the bank, depends in each case upon the particular and peculiar facts therein involved. In the instant case we conclude that the referee and the court properly held that the equity and rights of the bank were superior to the rights of the surety, especially in view of the fact that neither the contractor, the Van Doeselaar Company, nor the bank nor the city had any knowledge of the equitable lien provided for in the applications for the bonds.

In support of the position taken by the surety company it cites, among others, the following cases: *Joint School District v. Bailey-Marsh Co.* 181 Wis. 202, 194 N. W. 171; *Board of County Comm'rs v. Southern Surety Co.* 216 Mich. 528, 185 N. W. 755; *Detroit v. Fidelity Deposit Co.* 240 Mich. 213, 215 N. W. 394; *Henningsen v. U. S. F. & G. Co.* 208 U. S. 404, 28 Sup. Ct. 390, 52 Lawy. Ed. 547; *Salt Lake City v. O'Connor,* 68 Utah, 233, 249 Pac. 810, 49 A. L. R. 941; *Prairie State Nat. Bank v. U. S.* 164 U. S. 227, 17 Sup. Ct. 142, 41 Lawy. Ed. 412; *First Nat. Bank v. City Trust, S. D. & S. Co.* 114 Fed. 529, 52 C. C. A. 313. An examination of these cases will reveal that the contract either provided that a certain amount or percentage shall be reserved for the benefit of the materialmen and laborers or of the surety, or that a portion of the contract price remains unpaid when a default occurred in the performance of the contract. These two instances are specifically typified in the cases of *Joint School District v. Bailey-Marsh Co., supra,* and *Salt Lake City v. O'Connor, supra.*

The principal duty performed by a surety on a contract like the one here in question requires it to see that its principal performs. When it comes into a court of equity and maintains that it has superior equities with respect to a claim like that of a bank, it is incumbent upon it to show

that it has performed its duty. It cannot remain inactive and totally ignore the actual facts which transpire, as in the instant case, where the city and the contractor and the bank have acted in good faith, without knowledge of any rights or equities of the surety, and still insist that its equities are superior. Equity will not tolerate a surety to sleep on its rights, if it has any, and then claim such rights, to the prejudice of another claimant who has acted in good faith; and above all, a surety guilty of gross laches, as is manifested in the instant case, may lose its rights and equities by such laches.

In 5 Corp. Jur. pp. 955, 956, it is said:

"A prior assignee may forfeit his right by permitting his assignor to remain in possession of the evidences of a chose, whereby the assignor is enabled to dispose of it to a subsequent *bona fide* assignee for value, or by his laches in standing by and permitting a subsequent *bona fide* assignee for value to recover on the chose."

In 5 Corp. Jur. p. 974, it is said:

"According to the weight of authority, an assignee who takes without notice of latent equities in favor of third persons acquires priority over such equities."

It appears from the findings that the city has in its possession the sum of $10,628.51, the proceeds derived from special improvement bonds. From time to time, as the work of the contractor proceeded, sewer certificates were issued, based upon the estimates of work performed, and delivered to the bank as collateral security for moneys advanced. It also appears that these certificates were issued pursuant to orders executed by the contractor to the city, and that the amounts of certificates so delivered corresponded substantially with the bank's periodical advancements to the contractor. Prior to December 21, 1925, there was collected by the bank from the owners of the property specially assessed, upon certificates held by the bank, the sum of $8,872.14, and this amount

was applied by the bank upon the notes of the contractor. On the date last mentioned the bank still held certificates in the sum of $10,628.51, and on that date these certificates were purchased by the bank outright, and the notes held by the bank, of the contractor, were surrendered to the latter. It is therefore the contention of the bank that these certificates so received by it were taken by it as payment of its claim against the contractor.

Subsequent to December 21, 1925, the bank delivered these certificates to the comptroller of the city of Sheboygan, in accordance with the provisions of secs. 62.20 and 62.21, Stats., in order that improvement bonds might be issued thereon. In the interval, however, between such delivery of the certificates to the comptroller and the issuance of the improvement bonds, the sum of $1,336.49 was collected by the city upon these certificates, and thereafter the balance was received from the bonds in cash, constituting the total sum now held by the city,—the sum of $10,628.51,—which amount the city now holds for payment or distribution in accordance with the final judgment of the court.

It is the contention of the surety company that the amount so held by the city constitutes an unpaid portion of the contract price, and that it is entitled to such sum, or to an amount sufficient to protect it from liability as against all claims of the bank by virtue of assignments above referred to. The referee found that the delivery of these certificates to the bank constituted payments.

Sec. 62.20 (1), Stats., provides as follows:

*"Payment for public work.* (1) *Certificates; bonds.* When any contract is let for street improvement, the construction of any sanitary sewer or sewerage work, or surface or storm water sewer, or the laying of any water or heat main or lateral, or the laying or repair of any sidewalk, and the work covered by such contract is to be paid wholly or in part by special assessment upon the property to be benefited by the improvement, such contract may provide that

the part of the total cost of the improvement to be defrayed by such special assessment may be paid in cash or with certificates or bonds issued for such improvement or with the proceeds of the sale of such bonds, or both. The amount chargeable to the city shall be paid as the contract for the work may provide."

Sub. (2) provides:

*"When made.* Whenever any work mentioned in subsection (1) has been done under contract and the same shall have been approved by the board of public works, said board may issue to the contractor a certificate as to each parcel of land against which benefits have been assessed for the amount chargeable thereto. Such certificates shall be in such form as the board may prescribe."

The contract entered into between Schaefer & Sons, the city, and the surety company in substance follows the language of sec. 62.20 above quoted. The contract itself contains this specific provision:

"Said certificates and bonds shall be received by the contractor at par, but the city reserves the right to pay partly in certificates, partly in improvement bonds, and partly or all in cash. The contractor agrees to receive certificates or improvement bonds or both, at par for the work, so far as the amount or amounts thereof will pay the amount due on this contract, without any other claim against the city."

It thus becomes clear that as the sewer certificates were from time to time issued to the contractor and delivered to the bank, either upon assignments or orders, the face of these certificates constituted *pro tanto* payments. That is so because the statute authorizes it, the contract provides for it, and the certificates were actually delivered and accepted. Prior to December 21, 1925, over $9,000 of certificates delivered to the bank had been paid and the proceeds thereof in cash received by the bank. Had all of these certificates been paid on December 21st and the proceeds received by the bank, no question could be raised that the cash received

would constitute payment. The statute does not confine payments to either bonds or cash, but also includes certificates, and it is clear that the city can pay in any one of these three forms, in accordance with its discretion. Therefore, when the bank thereafter delivered these certificates to the city, it merely created the city as its agent for the purpose of converting the same into bonds. In other words, when the certificates were first delivered to the bank as aforesaid, the city parted title therewith, with the result that their subsequent delivery to the comptroller created merely the relationship of principal and agent.

The bank having received these certificates in good faith, and the referee having held that they were so received in payment, and at a time when there was no default on the part of the contractor, and the court having confirmed the referee's findings, it must follow, from what has heretofore been said, that the rights of the bank are superior to any equities on the part of the surety company.

On January 19, 1926, the contractor was adjudicated a bankrupt. The surety company contends that the delivery of the sewer certificates to the bank constitutes the bank a preferred creditor under the Bankruptcy Act, and that such preference is void. In any event, however, it must be conceded that the amounts received in sewer certificates prior to September 19, 1925, cannot be involved in this contention, for the reason that such deliveries were not made within the four-months period provided for by the federal statute. Reference has heretofore been made in this opinion to the fact that it was agreed between the bank and the contractor that the former's advances were to be made in consideration of the delivery of such sewer certificates, and that pursuant to such agreement and to the orders and assignments heretofore referred to, the sewer certificates were substantially delivered contemporaneously with the loans made by the bank.

There was therefore an adequate present consideration involved in each transfer. In 7 Corp. Jur. p. 174, it is said:

"The payment of an adequate present consideration by the transferee or incumbrancer negatives any fraud on creditors and is sufficient to sustain the transaction."

The referee further held (and such holding was confirmed by the court) that the bank did not have reasonable cause to believe that the contractor was insolvent at the times when certificates were delivered during the four-months period provided in the Bankruptcy Act. This finding was supported by the evidence, notwithstanding the existence of other facts and circumstances from which knowledge of insolvency might be inferred. The finding of the referee, therefore, on disputed evidence, confirmed by the court, cannot be disturbed. *Wojahn v. National Union Bank,* 144 Wis. 646, 129 N. W. 1068; *Goodwin v. von Cotzhausen,* 171 Wis. 351, 177 N. W. 618; *Truelsch v. Miller,* 186 Wis. 239, 202 N. W. 352; *Von Trott v. Von Trott,* 118 Wis. 29, 94 N. W. 798; *Ott v. Boring,* 139 Wis. 403, 121 N. W. 126.

Counsel for the surety company further takes the position that the sewer certificates were not assigned to the bank, because they were based on orders on the city executed by the contractor. On the other hand, it is asserted by the bank that such orders did in fact constitute assignments, and that this is further substantiated by the actually conceded delivery of the certificates. No formal language is necessary to constitute an assignment, if it appears that it was the intention of the parties that an assignment be effected. In 2 Ruling Case Law, pp. 614, 615, it is said:

"Since equity disregards mere form, no particular words or particular form of instrument is necessary to effect an equitable assignment. Any language, however informal, if it shows the intention of the owner of the chose in action to transfer it so that it will be the property of the transferee, will amount to an equitable assignment, if sustained by a sufficient consideration, which should be a valuable and not

merely a good consideration. It has been said that any order, writing, or act which plainly makes an appropriation of a fund or debt may amount to an equitable assignment; and that the true test of an equitable assignment is whether the debtor would be justified in paying the debt to the person claiming to be assignee."

But assuming that the title to these certificates had not passed, but that they were transferred as collateral to secure the payment of the indebtedness, and that the certificates were actually delivered in conformity with the agreement, the least that can be said in the premises is that the certificates constituted a pledge upon which the bank held an incumbrance, and that the bank held a lien upon such certificates as security. This situation is fully met in Black on Bankruptcy (3d ed.) § 362, p. 790, where it is said:

"*Equitable rights of third persons.* Aside from cases of preference and of fraudulent conveyance, a trustee in bankruptcy takes the property of the bankrupt subject not only to specific liens but also to equities in favor of third persons, whether arising out of the act of the bankrupt or by operation of law, which are not invalid as to creditors. Thus, for example, one having a claim against a fund by an equitable assignment from the bankrupt may assert it against the trustee in bankruptcy." See, also, Black, Bankruptcy (3d ed.) pp. 798, 799, § 364; p. 811, § 368.

The contention of the surety company in regard to this branch of the case is directed to the proposition that the certificates and the bonds, together with the proceeds thereof, when bankruptcy proceedings were instituted, passed to the trustee in bankruptcy. Here it must also be emphasized that the bank did not rely solely upon the orders and written assignments, but also upon the actual delivery to it of the certificates themselves.

Sec. 289.53, Stats., reads as follows:

"*Materials to contractors on public improvements.* (1) Any person, firm or corporation furnishing any material,

apparatus, fixtures, machinery or labor to any contractor for public improvements in this state, except in cities of the first class, however organized, shall have a lien on the money, or bonds, or warrants due or to become due such contractor for such improvements; providing, such person, firm or corporation shall, before the payment is made to such contractor, notify the officials of the state, county, township, city, or municipality, whose duty it is to pay such contractor, of his claim by written notice. It shall be the duty of such officer so notified to withhold a sufficient amount to pay such claim until it is admitted or established as provided in subsection (3) of this section and thereupon to pay the amount thereof to such person, and such payment shall be a credit on the contract price to be paid such contractor. Any officer violating the duty hereby imposed upon him shall be liable on his official bond. . . .

"(3) In any case where the contractor shall dispute the claim of the laborers or materialmen the right to a lien and to the moneys in the hands of the officer shall be determined by equitable action in the circuit court of the proper county; provided, that such action must be brought within three months from the time of serving the notice or notices required by subsection (1) of this section. . . ."

A number of the materialmen and laborers filed claims for lien under the provisions of the preceding sections, but none of them, with the exception of the Sheboygan Excavating Company, commenced an action within a period of three months from the time of the serving of the notice required by sub. (1) of said statute. It is conceded that the Excavating Company filed its notice of claim with the city on June 5, 1926, a period of over six months subsequent to the time when the last certificates were delivered to the bank. Therefore its claim for lien can only become effective as to the amount still due the contractor at the time when the notice was served.

Sec. 304.21, Stats., provides as follows:

"Whenever any person . . . shall recover a judgment against any person, . . . and said judgment debtor at the time of the rendition of said judgment, or at any time there-

after during the life of said judgment, shall have money due, or to become due, from . . . any city, . . . said judgment creditor may file a certified copy of such judgment with . . . the clerk of such city. . . .

"(2) It shall thereupon become the duty of the proper officers of such . . . city, after the expiration of thirty days from the date of filing the certified copy of said judgment, to pay to the owner of such judgment such sum as at the time of said filing is due, and thereafter and until said judgment is fully paid to pay to the owner of said judgment such sum or sums as may at any time or times be due from . . . such city to such person . . . and to deduct the sum or sums so paid as aforesaid from the amount due."

The record discloses that certified copies of judgments against the contractor were filed with the city under the provisions of the statute above referred to, as follows: Hildebrand Lumber & Supply Company, December 16, 1925; Ignatz Kroll, December 14, 1925; John Gielholdt, December 15, 1925; Trilling Bros. Oil Company, December 31, 1925; S. S. Hardware & Plumbing Company, December 14, 1925. From what has heretofore been said, these judgments can in no manner affect the amount belonging to the bank and held by the city. Furthermore, in view of the provisions of sec. 67 $f$ of the Bankruptcy Act, the fund upon which the judgment creditors claim a lien, if it existed (and the referee found that no such fund existed), would pass to the trustee in bankruptcy, and the lien claims of such creditors would necessarily be required to be adjudicated in the federal court.

It is further contended by the surety company that H. O. Schaefer & Sons at no time attempted to perform any of their contracts, and that they shortly after entering into the same executed an assignment thereof to the defendant Van Doeselaar Company; that the city of Sheboygan voluntarily accepted the Van Doeselaar Company as its contractor in the place and stead of H. O. Schaefer & Sons; that therefore a new contract relation was created between the Van Doese-

laar Company and the city of Sheboygan; that the Van Doeselaar Company is therefore a stranger to the surety company; and that the conduct of the city of Sheboygan in this matter, in failing to notify the surety company of such assignment and of such alleged new relationship, was of such a nature that it is now estopped to assert the liability of the surety company as surety in this case.

We are of the opinion that a situation like the one here involved was in the mind of the legislature when it enacted the provisions of sec. 289.16, Stats. Sub. (1) of said section contains the following provision:

"No assignment, modification or change of the contract, or change in the work covered thereby, nor any extension of time for completion of the contract shall release the sureties on said bond."

The surety company was engaged in the business of furnishing security for the performance of public building contracts for a valuable consideration. Its contract therefore became one of insurance, and is not to be construed according to the rules of law applicable to the ordinary accommodation surety. *Maryland C. Co. v. Eagle River U. F. H. S. Dist.* 188 Wis. 520, 205 N. W. 926. The contention of the surety company, therefore, cannot be sustained.

A number of other questions of law have been raised in the brief of the surety company, but we are convinced that they are not of sufficient importance to require treatment in this opinion.

We have examined the record in this case with respect to the facts involved herein, in order to ascertain whether in our opinion there is sufficient evidence to support the findings of the referee, and we are fairly satisfied that sufficient satisfactory evidence is therein contained. The referee has gone into the entire situation, both with respect to the facts and the law, and his report and opinion herein filed are able and exhaustive. The learned circuit judge, after a careful

consideration of the record and an examination of the briefs, has affirmed the report of the referee, and we are satisfied that substantial justice has been done. Under these circumstances we have concluded to affirm the judgment.

*By the Court.*—The judgment of the lower court is affirmed.

A motion for a rehearing was denied, with $25 costs, on June 24, 1929.